UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TD AMERITRADE, INC., | )<br>)<br>) |
| Plaintiff, | ) 3:08-CV-00245-LRH-RAM<br>) |
| v. | )<br>) ORDER |
| THE NEVADA AGENCY AND TRUST COMPANY, | )<br>)<br>) |
| Defendant. | )<br>) |

Defendant Nevada Agency and Trust Company's ("NATCO") and TD Ameritrade, Inc. ("Ameritrade") have each filed motions for summary judgment (##36, 40[1]). On June 28, 2010, the court held a hearing on the motions. Following the hearing, in accordance with the court's instructions, the parties submitted supplemental briefing (##81, 83).[2]

///

///

///

///

---

[1] Refers to the court's docket entry number.

[2] Ameritrade has filed a motion to strike (#84) NATCO's brief, arguing that the scope of the brief extends beyond the briefing permitted by the court. Because the court has not relied on any information in NATCO's supplemental brief that exceeds the scope of the court's directive, the court will deny the motion.

**I.     Facts and Procedural History**[3]

This is a diversity action arising out of NATCO's refusal to register, upon Ameritrade's request, the transfer of certain shares of Save the World Air, Inc. common stock owned by Guy Muller.[4] Save the World Air is a publicly traded company that develops and markets products designed to increase energy efficiency and decrease emissions primarily in motor vehicles. The company, which was originally known as Mandalay Capital Corporation, was formed on February 18, 1998. From February of 1999, to February of 2002, Jeffrey Muller was the company's President, Chief Financial Officer, and Chairman of the Board of Directors. Until October of 2001, when an independent board of directors was created, Jeffrey Muller was also the sole board member.

**A. The New York Litigation**

Based on concerns about Jeffrey Muller's conduct as Save the World Air's only executive officer and board member, on July 12, 2000, the Securities and Exchange Commission ("SEC") halted trading of Save the World Air stock on the Over the Counter Bulletin Board.[5] In 2002, as a result of its investigation, the SEC initiated an action in the Southern District of New York against Save the World Air and Jeffrey Muller, alleging that Jeffrey Muller led a fraudulent campaign to market a "Zero Pollution Fuel-Saving Device" and induce investors to invest in the company.

In the SEC litigation, Save the World Air filed a cross-complaint against Jeffrey Muller and

---

[3] NATCO asserts several objections to affidavits submitted by Ameritrade. To the extend that NATCO objects to the court's consideration of the judicial documents from the litigation in the Southern District of New York, it is appropriate for the court to take judicial notice of these documents. To the extend that NATCO objects to statements in Kathryn Goodman's affidavits, the court has not relied on any objectionable statements.

[4] Ameritrade is organized under the laws of New York and has its principal place of business in Nebraska. NATCO is a Nevada corporation.

[5] The Over the Counter Bulletin Board is an electronic trading service that displays real-time quotes, last-sale prices, and volume information for over-the-counter equity securities that are not listed on the NASDAQ stock exchange or a national securities exchange. Companies listed on the Board must be current with all required SEC filings, but need not meet market capitalization, minimum share price, or corporate governance requirements. Stocks traded on the Board are generally considered risky.

various members of his family, including his son, Guy Muller. The cross-claims arose from the issuance, on April 28, 1998, of twelve 500,000-share blocks of Mandalay Capital Corporation stock, Save the World Air's former corporate name, to twelve offshore entities that Jeffrey Muller and his family allegedly controlled. Several of the 500,000-share blocks were later subdivided to various persons in private stock sale transactions from which payments were made to, or on behalf of, Jeffrey Muller or his family members, including his son, Guy Muller.

On July 30, 2002, the Honorable George B. Daniels, United States District Judge for the Southern District of New York, issued a preliminary injunction. In relevant part, the preliminary injunction prohibited the cross-defendants, including Guy Muller, and the cross-defendants' officers, agents, servants, trustees, employees and attorneys, from "[s]elling, transferring, or encumbering all assets and property, in which [the cross-defendants] own[] or ha[ve] an interest in . . . including but not limited to: [(]i) any and all shares issued by [Save the World Air] on April 28, 1998 . . . and (v) any stock certificates or shares that comprise the shares transferred on April 28, 1998, by [Save the World Air] to any of the cross-defendants[.]" (Def.'s Mot. Summ. J. (#40), Ex. E.)

Both the SEC and Save the World Air subsequently filed motions for summary judgment. On November 15, 2005, the court granted summary judgment in favor of the SEC. Among other remedies, the court ordered Jeffrey Muller to disgorge permanently four million shares of Save the World Air stock issued on April 28, 1998, and any other shares of Save the World Air stock Muller owned. The court further ordered Save the World Air to "cancel any issued and outstanding shares of STWA stock still owned by Muller, including the four million shares that he received [as a result of the issuance of stock on April 28, 1998.]" (Desmond Decl. (#38), Ex. C. at 46.)

On October 27, 2006, the court ruled on the motion for summary judgment filed by Save the World Air. In addition to ruling on the motion for summary judgment, the court addressed several issues that remained unresolved following its November, 2005, order. In relevant part, the

3

court modified the November, 2005, order to "include within the scope of the required disgorgement any STWA shares that Muller *or any of his nominees directly or indirectly own or control at the present time*." (Desmond Decl. (#38), Ex. D at 2) (emphasis added). In making this statement, the court specifically noted, "I have phrased the modifications in this way to make clear that any third parties who purchased shares of STWA stock from Muller or his nominees will not be subject to disgorgement or the cancellation of their shares." (*Id.*)

As to Save the World Air's claims against the cross-defendants, the court held,

> To the extent that Alan and Melissa[, two of Muller's children,] continue to own or hold any [STWA shares stemming from the issuance of 500,00-share blocks of Save the World Air stock to twelve offshore corporations], STWA will presumably be able to recapture them pursuant to the modification of my Decision which extends its reach to any STWA shares that Muller or any of his nominees directly or indirectly own or control at the present time.

(*Id.* at 3.) The court, however, denied relief as to Guy Muller because Save the World had failed to demonstrate that he had been properly served or appeared in the action.

Following the court's order, Save the World Air filed an affidavit of service with respect to Guy Muller. On February 8, 2007, the court amended its prior order to read, with respect to Alan, Melissa, and Guy Muller, "[t]o the extent that these defendants continue to own or hold any such shares, STWA presumably will be able to recapture them pursuant to my Decision which extends its reach to any STWA shares that [Jeffrey] Muller or any of his nominees directly or indirectly own or control at the present time."

**B. Guy Muller's Ameritrade Account**

Guy Muller had a brokerage account with Ameritrade, enabling him to place trades on-line, with a broker, or through a phone service. Among other functions, Ameritrade processes deposit and withdrawal requests and sends clients' trades to the market, which means that when clients enter an on-line request with Ameritrade to execute a trade, Ameritrade sends the instructions from the client to the market. Ameritrade charges its clients a commission of around ten dollars to place

an on-line trade.

On June 12, 2002, NATCO countersigned and registered in the name of Guy Muller the transfer of Save the World Air shares bearing certificate numbers 2157 to 2163. These share certificates were the result of the division of a certificate for 500,000 shares registered to Pacific Ltd, one of the 500,000-share blocks described above and originally issued on April 28, 1998. These shares were the subject of Save the World Air's cross-claims in the New York litigation.

Since April of 1998, NATCO has been Save the World Air's transfer agent. A transfer agent maintains the stock ledger for corporations and records the registration of the transfer of securities. On July 3, 2002, Save the World Air notified NATCO of the court's entry of the temporary restraining order that eventually became the preliminary injunction. Save the World Air instructed NATCO, as Save the World Air's transfer agent, not to permit the transfer of any shares covered by the court's order. Because the preliminary injunction prohibited the sale or transfer of shares in which Jeffrey and Guy Muller owned or had an interest, Save the World Air's instruction would include stock certificates 2157 through 2163, which, as a result of the June 12, 2002, transfer, were registered to Guy Muller.

In July of 2002, Muller attempted to sell or transfer, through Ameritrade, some of his Save the World Air shares. However, on July 19, 2002, because of the court's order, the Depository Trust Company ("DTC") rejected Muller's shares, and Ameritrade returned the shares to Muller.

Over the next few months, Muller made several unsuccessful attempts to transfer his Save the World Air shares. For example, Muller's Ameritrade statement covering the period from October 26, 2002, to November 29, 2002, contains the following notation next to a transaction dated November 1, 2002: "Return to Client- there is a court order preventing transfer[.]" (Def.'s Mot. Summ. J. (#40), Ex. J at NATCO 2045.) Similarly, the following notation appears after a transaction dated November 4, 2002: "Cannot send to [transfer agent] because of court order[.]" (*Id.*)

### C. Confusion Over Save the World Air Technologies, Inc. Stock

In June of 2004, Muller deposited shares of Save the World Air Technologies, Inc. into his Ameritrade account. After the deposit, on August 24, 2004, an Ameritrade representative made a note on Muller's account stating, "There was a court order prohibiting the shares from being transferred into street name. We returned the shares to the client in November of 2002. In June of 2004 he deposited the shares again. They are clear now and I called the transfer agent to verify that the shares had been transferred. They were transferred on 7/2/04." (*Id.*, Ex. K.)

Save the World Air Technologies, however, is an entity distinct from Save the World Air. Save the World Air Technologies shares have never been subject to a court order. Thus, it appears that when the Ameritrade representative contacted NATCO to confirm the validity of the shares, the Ameritrade representative mistakenly believed that NATCO cleared for transfer the Save the World Air shares rather than the Save the World Air Technologies shares.

### D. NATCO's Refusal to Register the December, 2006, Transfer

On December 8, 2006, Muller deposited 200,000 of his Save the World Air shares into his Ameritrade account. On December 21, 2006, Muller deposited the remaining 300,000 shares into his account. By Irrevocable Stock or Bond Powers dated November 28, 2006, and December 14, 2006, Muller endorsed these shares to Ameritrade.

Without conducting any investigation into the shares and allegedly in compliance with its general practice, upon receiving the stock certificates and instructions from Muller for their sale, Ameritrade presented the shares to the DTC. DTC then forwarded the certificates to NATCO, the transfer agent, to register the transfer and issue new certificated shares pursuant to the DTC's instructions. Citing the Temporary Restraining Order and Order to Show Cause for Preliminary Injunction, in late December of 2006, NATCO rejected the transfer and refused to register the certificates.

Generally, Ameritrade places a three-day settlement hold on its accounts following a trade

6

before releasing funds to the client. However, clients that hold margin accounts are able to withdraw funds immediately following a trade. Muller had such a margin account. As such, after selling the Save the World Air shares in December of 2006, Muller's account was immediately credited for the sale. As a result of the sale, Muller withdrew $140,000 from his Ameritrade account.

By the time NATCO refused to register the certificates, Muller had already sold the shares and withdrawn the funds from his account. As a result, Muller's Ameritrade account was "left . . . short shares." (Def.'s Mot. Summ. J. (#40), Ex. I at 108:16-21.) To cover the short position, Ameritrade purchased Save the World Air shares on the open market for $365,405.09.

Upon learning of the rejection, Ameritrade contacted Muller and informed him that he was responsible for any debit balance on his account. To date, Muller has not paid the debit balance, and Ameritrade has not taken legal action against him.

## II.     Legal Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

Where, as here, parties file cross-motions for summary judgment on the same claims before the court, the court must consider each party's motion separately and on its own merits. *Fair Hous. Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted). "[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and oppositions to both motions, before ruling on each of them." *Id.* at 1134.

**III.  Discussion**

Ameritrade alleges that NATCO's refusal to register the transfer of Guy Muller's Save the World Air certificates in December of 2006 violated Nevada Revised Statutes section 104.8401. Section 104.8401 outlines the requirements giving rise to a duty on the part of an issuer to register the transfer of securities. Under the section, where the specified requirements have been met, a person that presents a security for transfer may recover losses resulting from "unreasonable delay in registration or failure or refusal to register the transfer." Nev. Rev. Stat. § 104.8401(2).

8

Ameritrade contends it is entitled to summary judgment because each of section 104.8401's requirements have been satisfied. NATCO counters that it is entitled to summary judgment because (1) Ameritrade lacks standing, (2) Ameritrade cannot demonstrate that the requirements of section 104.8401 have been met, and (3) Ameritrade suffered no damages as a result of any action by NATCO. To the extent necessary, the court will address these arguments below.

**A. Constitutional Standing**

Article III of the United States' Constitution requires federal courts to adjudicate only actual cases and controversies. *Allen v. Wright*, 468 U.S. 737, 750 (1984). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Id.* at 750-51 (*quoting Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Generally, "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Id.* at 752. "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . it often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500.

The standing doctrine has a constitutional and a prudential component. *Elk Grove Unified Sch. Dist. v. Newdow*, 541 U.S. 1, 11 (2004). To satisfy the constitutional component, a plaintiff must meet the following three requirements: (1) the plaintiff must have suffered an injury in fact that is not conjectural; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

NATCO argues Ameritrade lacks standing because NATCO has not caused Ameritrade to suffer any injury. The court disagrees. The heart of NATCO's arguments go to the merits of Ameritrade's claim, namely, whether NATCO had a duty to register the transfer of the Save the

9

World Air shares. If NATCO had such a duty, Ameritrade's injury would be "fairly traceable" to NATCO's action. Although Ameritrade's own conduct may have contributed to its injury and although Guy Muller may have played a role in Ameritrade's loss, if true, the facts alleged in the complaint would support a finding that NATCO caused Ameritrade some injury. Because Ameritrade has alleged facts suggesting that it suffered an injury in fact that is fairly traceable to NATCO's conduct and can be redressed by a favorable judicial decision, the court finds that Ameritrade has standing.

**B. Statutory Standing**

NATCO next argues that Ameritrade does not have standing to sue under Nevada Revised Statutes sections 104.8401(2) and 104.8407. Pursuant to Nevada Revised Statutes section 104.8407, a transfer agent has the same obligation as the issuer to the "holder or owner" of a security. Nev. Rev. Stat. § 104.8407. According to NATCO, Ameritrade was never a holder or owner of the shares of Save the World Air stock within the meaning of section 104.8407. In relevant part, section 104.1201(2)(u) defines a "holder" as the "person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession . . . ." Nev. Rev. Stat. § 104.1201(u)(1).

Ameritrade falls within this definition of the term "holder." When Guy Muller delivered the shares to Ameritrade for deposit into his account, Ameritrade came into possession of the shares. Further, Muller made the shares payable to Ameritrade by endorsing them to Ameritrade upon delivery. Accordingly, Ameritrade was a holder within the meaning of section 104.8401(2). Because NATCO is the issuer's, Save the World Air, transfer agent, under section 104.8407, NATCO owed Ameritrade the same duty to register the transfer of securities as Save the World Air owed Ameritrade.

///

///

**C. NATCO's Liability Under Nevada Revised Statute Section 104.8401**[6]

Next, NATCO argues it cannot be liable under sections 104.8401 and 104.8407 because it had no obligation to Ameritrade that went unfulfilled. The parties dispute whether the following two section 104.8401(1) requirements have been met: (1) that the transfer "does not violate any restrictions on transfer imposed by the issuer in accordance with NRS 104.8204" and (2) that the transfer "is in fact rightful or is to a protected purchaser."[7] Nev. Rev. Stat. §§ 104.8401(1)(e), (g). Because the court finds the first of these requirements determinative, the court will address only that requirement below.

Section 104.8401(1)(e) requires that the transfer not "violate any restriction on transfer

---

[6] Although NATCO frames this as a statutory standing argument, NATCO's contentions go to the merits of Ameritrade's claims.

[7] In its entirety, section 104.8401(1) provides,

If a certificated security in registered form is presented to an issuer with a request to register transfer or an instruction is presented to an issuer with a request to register transfer of an uncertificated security, the issuer shall register the transfer, pledge or release as requested if:

(a) Under the terms of the security, the person seeking registration of transfer is eligible to have the security registered in his name;

(b) The endorsement or instruction is made by the appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(c) Reasonable assurance is given that the endorsement or instruction is genuine and authorized;

(d) Any applicable law relating to the collection of taxes has been complied with;

(e) The transfer does not violate any restriction on transfer imposed by the issuer in accordance with NRS 104.8204;

(f) A demand that the issuer not register transfer has not become effective under NRS 104.8403, or the issuer has complied with subsection 2 of that section but no legal process or indemnity bond is obtained as provided in subsection 4 of that section; and

(g) The transfer is in fact rightful or is to a protected purchaser.

11

imposed by the issuer in accordance with NRS 104.8204." Section 104.8204 provides,

> A restriction on transfer of a security imposed by the issuer, even if otherwise lawful, is ineffective against any person without actual knowledge of the restriction unless: (1) The security is certificated and the restriction is noted conspicuously on the security certificates; or (2) The security is uncertificated and the registered owner has been notified of the restriction."

Nev. Rev. Stat. § 104.8204.

The parties dispute whether Ameritrade had actual knowledge of any restriction imposed by Save the World Air. On July 3, 2002, Save the World Air notified NATCO of the court's entry of the temporary restraining order that eventually became the preliminary injunction. At that time, Save the World Air instructed NATCO, as Save the World Air's transfer agent, not to permit the transfer of any shares issued on April 28, 1998, until further notice. This is a restriction on transfer imposed by the issuer.[8] The issue is therefore whether Ameritrade had actual notice of this restriction.

Nevada Revised Statutes section 104.1202 generally defines the term notice. As to a corporation, the section provides,

> Notice, knowledge, or a notice or notification received by an organization is effective for a particular transaction from the time it is brought to the attention of the natural person conducting that transaction and, in any event, from the time it would have been brought to the natural person's attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require a natural person acting for the organization to communicate information unless the communication is part of the natural person's regular duties or the natural person has reason to know of the transaction and that the transaction would be materially affected by the information.

Nev. Rev. Stat. § 104.1202(6).

The Official Comment to section 104.1202 states, "Subsection [6] makes clear that reason

---

[8] The parties focus their arguments primarily on whether the preliminary injunction was a restriction on transfer imposed by the issuer. While it is not entirely clear which party requested the preliminary injunction, even if Save the World Air was the requesting party, the parties have not explained how a preliminary injunction, which is imposed by the court, can be deemed a restriction imposed by the issuer.

12

to know, knowledge, or notification, although 'received' for instance by a clerk in Department A of an organization, is effective for a transaction conducted in Department B only from the time when it was or should have been communicated to the individual conducting that transaction."

NATCO does not dispute that information concerning the existence of court orders preventing the transfer of Muller's shares was never communicated to the Ameritrade representative responsible for the December, 2006, transactions. Instead, NATCO argues that, although the information was never actually communicated to the Ameritrade representative, Ameritrade should have communicated the information. The court agrees.

After the DTC refused to register the transfer of Muller's shares on July 19, 2002, on at least two other occasions, Ameritrade made notes on Muller's account stating that a court order prohibited transfer of the shares. As such, Ameritrade had actual knowledge of the restriction on transfer. While the notes on Muller's account also indicate that in 2004, the court cleared the Save the World Air shares for transfer, it is undisputed that this information was incorrect. As discussed above, in June of 2004, Muller deposited shares of Save the World Air Technologies into his account. An Ameritrade representative subsequently made a note on Muller's account stating, "There was a court order prohibiting the shares from being transferred into street name. We returned the shares to the client in November of 2002. In June of 2004 he deposited the shares again. They are clear now and I called the transfer agent to verify that the shares had been transferred. They were transferred on 7/2/04." ((Def.'s Mot. Summ. J. (#40), Ex. K.)

Thus, the evidence indicates that the Ameritrade representative mistakenly believed that NATCO had cleared for transfer the Save the World Air Shares, rather than Save the World Air Technologies shares. No evidence before the court suggests that this mistake falls on any entity other than Ameritrade, and Ameritrade has not presented evidence indicating that, despite this error, its has acted with due diligence.

In sum, Ameritrade has failed to explain how, as a result of its own mistake, NATCO

13

should be liable for Ameritrade's loss. Because Nevada Revised Statutes section 104.8401 requires that each of the stated requirements be satisfied before a duty to register the transfer of securities is imposed, the court finds that Ameritrade has failed to raise questions of fact suggesting that NATCO had such a duty. As no reasonable jury could conclude that Ameritrade lacked actual notice of a restriction on transfer imposed by Save the World Air, the court will grant summary judgment in NATCO's favor.

IT IS THEREFORE ORDERED that Ameritrade's Motion for Summary Judgment (#36) is DENIED.

IT IS FURTHER ORDERED that NATCO's Motion for Summary Judgment (#40) is GRANTED.

IT IS FURTHER ORDERED that Ameritrade's Motion to Strike (#84) is DENIED as moot.

IT IS SO ORDERED.

The Clerk of the Court shall enter judgment accordingly.

DATED this 9th day of September, 2010.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE